NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250684-U

NO. 4-25-0684

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 25, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| JESSIE A. ALDERSON, | ) | No. 25CF93 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Vancil and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court reversed the trial court's order denying defendant pretrial release and remanded for a determination of the appropriate conditions of release.

¶ 2    Defendant, Jessie A. Alderson, appeals the trial court's order denying him pretrial release pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2024)). Specifically, defendant argues on appeal that

"the State did not prove by clear and convincing evidence that [defendant] posed

an unmitigable real and present threat of sexual assault of [the victim] or any

other child where [defendant] proffered that he no longer had a pseudo-familial

relationship with any child, and the State's proffer, including that [defendant] had

not assaulted [the victim] for at least five years, was consistent with

[defendant's]."

¶ 3    For the reasons that follow, we reverse and remand for a determination of the appropriate conditions of release.

¶ 4                              I. BACKGROUND

¶ 5              A. The State's Petition To Detain and the Hearing Thereon

¶ 6    On April 29, 2025, the State charged defendant with one count of predatory criminal sexual assault (720 ILCS 5/11-1.40(a)(1) (West 2016)), alleging that defendant, on or about July 2017 through June 2020, knowingly committed an act of sexual penetration between the hand of the defendant and the vagina of A.D., while A.D. was under 13 years of age.

¶ 7    Later that same day, the State filed a verified petition to detain defendant, alleging that he posed a threat to the safety of persons or the community, and the trial court appointed counsel for defendant.

¶ 8    Also on April 29, the trial court conducted a hearing, at which it stated that it would first hear from the State to determine whether there was probable cause. If it found probable cause, then the court would take up the matter of the State's request that defendant be detained.

¶ 9    The prosecutor then made the following proffer:

        "This investigation began with the Streator Police Department in February of 2025 when they received a walk-in report at their police department in regards to a sexual assault. They arrived and made contact with an individual identified as Lucinda H[.] who advised that she was attempting to get custody of a minor child by the initials AD who was her, related to her in some nature.

        She, when she was speaking with AD, AD had disclosed to some of her cousins that she had been sexually assaulted previously by who she referred to as

- 2 -

her uncle, identified as this Defendant Jessie Alderson, and also believed another individual or disclosed that another individual had sexually assaulted her as well.

Based on that report, an interview of AD was scheduled at the Children's Advocacy Center in Ottawa, Illinois in March of 2025. That interview was conducted by a trained forensic interviewer. When speaking with AD, she disclosed in relation to this Defendant that, she described this Defendant as her uncle's brother, stated that he had called where she was staying and had asked for her help in wrapping presents, Christmas presents for his girlfriend. She indicated that her older cousin wanted to come with her but that this Defendant would not let the older cousin come. It was just going to be AD. He then picked AD up and brought her to where he was at, which was his parents' residence. It was eventually identified that that residence was in Long Point here in Livingston County, which is how this case eventually ended up here.

AD disclosed that she fell asleep while with the Defendant and that when she woke up, she woke up and he was touching her. She described that she was really young, estimating she thought she was around five years old when this incident took place, and indicated that the Defendant lived with his parents at that residence. She stated that she felt something going inside her. She stayed quiet trying not to cry. When she was asked what was going inside her, she described the object as feeling like skin. She was able to describe her clothing. She also recalled that the Defendant had a, like a really cold drink. She described being able to hear the ice moving in the cup and described the cup as a blue and white container that you would get at a gas station to put soda in believing that it came from the Circle

K gas station. She was able to describe that she was wearing shorts that somehow got pulled down while this incident was occurring and opined that this Defendant moved them down as she had been sleeping. When she fell asleep, they were on normal; and when she woke up, they were down around her calves. She woke up with both her pants and underwear pulled down and was able to describe the Defendant's bedroom where she fell asleep at.

After this incident was referred to the Livingston County Sheriff's Department, Detective Chase with the Sheriff's Department made contact with this Defendant. He conducted an interview with the Defendant on April 28th of 2025. It was an audio video recorded interview where this Defendant waived *Miranda* [(see *Miranda v. Arizona*, 384 U.S. 436 (1966))] and agreed to speak to Detective Chase.

During the course of that conversation, this Defendant admitted to touching his niece identified as AD and described that he thought she would have been between the age of four and six years old. He described the incident to have taken place at his parents' house in Long Point. He stated that they were in his bed originally. When they fell asleep, they were at opposite ends; but when he woke up, she was on the same side of the bed as him. When he described it to Detective Chase, he indicated that he had been having a dream about a girl that he was into or had a crush on; and in his dream, the girl was wearing a bra and underwear; and he had his hand underneath the girl's underwear rubbing her vagina. He indicated that he then woke up, and he was rubbing his niece's, AD's vagina.

Through the course of this interview, he also confirmed other parts of AD's disclosure being in regards to the wrapping of the Christmas presents as well as that he would often get Polar Pops from the gas station, and that was the cup that was described by AD.

He was also further asked while he was at the Livingston County Sheriff's Department in regards to any other children. He indicated to Detective Chase that he had another niece and that when she was around the age of ten to 13 she wore something attractive, and he asked her if she wanted to have sex. That disclosure or statement by this Defendant is still being investigated at this time."

¶ 10 The trial court stated that it found probable cause based upon the State's proffer.

¶ 11 When the State said it had filed a petition to detain defendant, defense counsel stated that she would need time to speak to defendant to prepare for a detention hearing. The court continued the matter until the following day.

¶ 12 On April 30, 2025, the trial court conducted a detention hearing. The court started by noting that it had received a pretrial services report that indicated defendant was 33 years old, had no children, and had been living with his girlfriend in Pontiac, Illinois, for the past three years. He had been working full-time at Walmart for the past five years and had no prior criminal convictions.

¶ 13 The State indicated it did not have any further evidence to present beyond what it had earlier presented by way of proffer to the court. The State then spoke in support of its petition to detain as follows:

"For the State to prove this petition, we have to prove three elements by clear and convincing evidence. First, that the proof is evident or presumption great that the defendant has committed the offense.

The Court recalls the statement of facts that was proffered to the Court yesterday. There was a detailed disclosure by a minor child involving this defendant and her waking up to his hand on her vagina, his finger in her vagina. When Detective Chase interviewed this defendant, he verified many of the details that were given by the victim and although at first denied this offense, ultimately admitted to committing this offense. And so, I do believe that first element, that the proof is evident, presumption great has been proven by clear and convincing evidence.

The second element, that the defendant poses a real and present threat to the safety of any person, persons or the community, based on facts of this case, it's commonly referred to as this dangerousness element. There is [*sic*] nine factors set out in the statute for the Court to consider as well as other factors that the Court can consider in determining this dangerousness element.

Your Honor, in this case, we have an individual who is, stands accused of a very serious offense, a predatory criminal sexual assault. It's a class X felony that is of such a serious nature that the Legislature has actually expanded the sentencing. It's not just six to 30, which is typically of a class X; a predatory is a six to 60 year sentence, that's not eligible for a probation sentence. That goes to show just how serious in nature this offense is. This is a forcible felony crime of violence.

Through this case, through the facts that are presented, the victim in this case was very young. She believed that she was around five. The defendant put her between four to six years old when this incident occurred, and he was in the care of her [*sic*]. He was, she refers to him as her uncle. He had asked to have her come stay with him. He was caring for her. She was helping him wrap Christmas presents and then stayed there. And so, all of those are factors that I think heighten this dangerousness level in this case.

In addition to this, when he was interviewed by Detective Chase, he further admitted, which is, if the Court recalls the proffer, is still being investigated for potential charges down the road, but admitted to a second juvenile individual, indicating that he did ask this second individual if she wanted to have sex with him. At this time, as I indicated, that's still being investigated as to whether or not any actions did occur between the two of them; but he was, would have been, he was an adult at that time and placed her between the ages of 10 and 13, indicating that it was his niece, so yet another individual that he essentially is in this position of trust with. Your Honor, I think that those are facts of this case that are important for this Court to consider in determining whether or not he meets this dangerousness standard.

I acknowledge that his [Virginia Pretrial Risk Assessment Instrument-Revised (VPRAI-R) score] is a zero, that he has no prior criminal record. Those are things of course for the Court to consider in these factors tests; but the State's position is that his risk of dangerousness far outweighs the fact that he has not had any prior criminal record and a VPRAI[-R] score in that sense.

And so, I do believe that the State has proven the second element by clear and convincing evidence.

And so, if the Court does find that, then the third element is that there's no condition or combination of conditions that mitigate this dangerousness that he poses. It's not an element that there just are no conditions, they have to mitigate his dangerousness.

And so, when looking at that, we're looking at primarily or what [the Office of Statewide Pretrial Services (OSPS)] has to offer to monitor the defendant if he were to be placed in the community. And that's contained in People's Exhibit No. 1.

There are two pretrial officers here in Livingston County that can meet with the defendant on a specified basis by this Court. The preference is to meet in person, but they can also meet on the phone. Even if the Court were to order the highest reporting, which is on a weekly basis, that doesn't mitigate the dangerousness that he poses any time that he's not in that OSPS office. And further adding to that, that there is, as contained in State's Exhibit 1, the Court does not get notified until he's missed several appointments in a row, meaning there could be a good chunk of time that he is not reporting, that we don't know where he's at, what he's doing, if he's being compliant with the court orders or not. So, the State's position is that that condition does not mitigate the dangerousness that he poses.

There is GPS monitoring that is available through OSPS. They are able to view that live. The Court can put in essentially like an area or areas that the defendant's not allowed to be, and it would notify OSPS if he violated that order as

well; but, again, there's this reporting process. And what GPS monitoring doesn't do is tell us who he's with. It just tells us where he's at and if he's within where he's supposed to be. It doesn't tell us who he's interacting with, whether or not that individual is a minor, what they're doing when they're interacting. Basically, it just gives us a location; and that, in and of itself, does not mitigate the dangerousness that he poses to minors in the community.

In regards to other monitoring, there is [secure continuous remote alcohol monitoring (SCRAM)] available, which I don't think is applicable or appropriate based on the facts of this case. And then, other than GPS or SCRAM, there's no other electronic surveillance available.

In regards to phone, Internet, social media, OSPS can go through a device if that device is provided to them during this meeting, that is also contingent on the defendant appearing at the meeting; but other than whatever device he provides, they don't have the ability to know if there's any other devices, if they, or they don't have any specialized training in going through those devices to know whether or not he is communicating with minors via the Internet, of any type of app, or anything of that nature.

They don't do home visits as it's deemed too dangerous for them to do so. And so, majority of what they have the ability to monitor is based on self-reporting by the defendant.

I would acknowledge that, yes, in this case when the defendant was interviewed, he did ultimately admit to what he is charged with to Detective Chase; but what I would indicate is, that he didn't just show up to Detective Chase and say,

hey, I want to tell you something that I've done. It was an interview; and at first, he was adamant that it didn't happen. And I only argue that, not because he is required to do so, but, because he does have that right to not give a statement, but when you are looking at whether or not self-reporting mitigates his dangerousness, I think that that is important for the Court to consider in that he was not forthcoming when asked questions, when he agreed to answer those questions, until further questioning by Detective Chase. And so, that leans towards whether or not he would be forthcoming with OSPS who, by the way, is not trained to do an interview such as a detective would be trained to do so.

And so, I do think, [Y]our Honor, that while there are conditions, there are not conditions that mitigate his dangerousness.

And so, for those reasons, I do believe the State has proven all three elements, by clear and convincing evidence, and would ask that this defendant be detained pending adjudication of this case."

¶ 14 In response, defense counsel made the following argument to the trial court: "My client is 33 years old, and he has no priors; and the fact that he has no priors I think is a mitigating factor that should be given serious consideration, primarily based upon how long ago this alleged incident occurred. The latest date on here is June of 2020, in a couple of months, it will be June, 2025; so, we're looking at a time range of five to eight years ago. The question of whether or not he poses a serious risk today, I think the fact that he has no priors, the fact that this alleged incident did happen five to eight years ago, significantly decreases the possibility that he is a danger to others or someone else in the community.

I did need to proffer that he does not have access to any children under the age of 18; and that while the State wants to take away from the fact that he did make an admission to the police officer, he did ultimately give his version of what happened. And while it doesn't take away from what has been, he's been charged with, it does in a sense provide some mitigation if his version is to be at all believed of how this incident allegedly occurred.

My client is willing to comply with any and all pretrial conditions that the Court would impose; and I think any and all conditions that are available to the Court, would certainly provide adequate assurances that [defendant] is not going to be a harm to anybody else. And so, for these reasons I don't believe that the dangerousness standard for this particular offense, especially given the time frame when it allegedly occurred, that there is not a risk of dangerousness for [defendant] moving forward.

I understand that this is a nonprobationable offense; however, I don't think that [defendant] should be detained while these charges are pending. And so, for that reason, I am asking that you deny the State's motion, petition to detain him."

¶ 15    The trial court ordered defendant's detention, explaining as follows:

"In this case, the defendant is charged with a very serious, nonprobation, class X felony sex offense; so, that I do think is significant. Although it is true and remains at this point that the defendant is presumed to be innocent of those charges against him; I understand he's made some admissions, and I will talk about that.

But, regardless, pursuant to the Pretrial Fairness Act provisions of Public Act 101-652, the law still does presume that this defendant is eligible for pretrial

release; and he cannot be detained unless the State meets its burden of proof under the dangerousness standard.

In regards to that, the statute does set forth a number of factors that the Court is to take into consideration. I have considered all of the evidence that's been proffered and argued here today as well as the pretrial investigation report and Exhibit A from the State. I am going to point out the things that stand out in my mind; and just because I don't mention a specific factor, it does not mean I didn't take it into consideration, that particular factor.

In addition, I am very mindful of the Court's order in the *Charles Smith* case [(see *People v. Smith*, 2025 IL App (4th) 241441-U)], which was a recent case out of this Court that I think has some similarities to this case; but I do believe there are also differences. And I believe in the *Smith* case, the Court was directed that each case needs to be looked at on its own individual merits; and so, I am looking at this case on its own facts and circumstances in making this decision.

To begin with, as I indicated, these are very serious charges. They involve really this defendant luring a young minor to his home, a minor that he knew. Now, whether that is by blood relation or close family friends or relatives of friends, friends of relatives, I mean it kind of went back and forth in regards to that, but, regardless, he knew this minor, he lured this minor. She wanted somebody else to come on that day; and that other person, or this defendant said, no, just you come. So, I mean there was quite a bit of, luring, I guess is the best word I can come up with, to get this minor to his home that day. So, it is a little suspicious considering the defendant's version of what happened, which regardless of the fact that there

may be, what I would deem as, I don't really want to say, excuses, because I don't really think it was an excuse, but explanation as to what the defendant believed happened and the circumstances surrounding it. The bottom line is, the defendant did admit; and that is much different than the facts in the *Smith* case. Here, there is no doubt that this defendant did commit this offense, he's admitted it. Now, there may be mitigating factors, I don't know; but as far as proof being evident or the presumption great that this defendant committed a qualifying offense for which he would be statutorily eligible for detention under the dangerousness standard, I think that's pretty open and shut, based not only on the proffer from the State, but the defendant's own admissions and corroborating many of the things that the victim indicated.

In addition, I am very mindful that this defendant does not have a prior record. He is much younger than the defendant in the *Smith* case; and, more importantly, there appears to be another minor victim in this case based upon statements that the defendant made. So, that is being investigated, but it came out of the defendant's own mouth; so, you know, there appears to be more than one victim that we know of at this point. And the victims in this case are minors, they are still minors; they made the admissions while they're minors, at least the victim in this particular case, I shouldn't say both victims, but one victim is still under the age of 13, according to the proffer from the State. The other victim, I'm not sure; the defendant indicated that he thought she was in the range of 10 to 13 years old. And I'm not, I think for clarification for the record, I recognize that no charges are pending in regards to that matter; but I do think it does go to the threat of harm to

others in the community. The defendant has made an admission that he has engaged in this type of conduct with another minor child. I think that is something that the Court needs to be very mindful of when considering whether or not this defendant poses a real and present threat to the safety of any person, persons or the community. So, unlike the *Smith* case, this defendant, there are two minor, or one minor victim in this case, defendant has admitted there may be another victim out there that was young. They're both still minors. They both live in this area.

There's no evidence that they've left the area. Is that correct, [prosecutor]?

[THE PROSECUTOR]: Not that I'm aware of, [Y]our Honor.

THE COURT: Okay. So, this is not a situation like *Smith* where the victims are now adults and living out-of-state. This defendant would presumably have fairly easy access to these children if they are in the area, and neither one of them is even old enough to drive.

In addition, another distinguishing factor is that this defendant is working at Wal-Mart. Now, I understand that, and I'll get into this later about whether or not there can be restrictions in place, but he does have access to minor children. To suggest that he doesn't have access to minor children, I think, belies the record. He's working at Wal-Mart, any of us that go to Wal-Mart understand there are young children very often at Wal-Mart; so, the defendant would have access to minor children.

In addition, I am a little concerned that the pretrial officer indicated that he was unable to verify any of the information that was provided to him. The defendant indicated that he provided both his girlfriend and his mother as verification

- 14 -

contacts; and I guess, as of now, the Office of Statewide Pretrial Services has not been able to verify any of the information that was provided. So, really this is all based upon self-reporting, which I think the State makes a good point that the defendant was not initially forthcoming with his statements to law enforcement; so, it is a little hard to rely on self-reporting.

Now, I am mindful that the defendant scored a zero on his VPRAI[-R]. Generally, that is used primarily by OSPS to determine a level of contact; but even if this Court were to order more frequent contact, I do not believe that would be sufficient. According to their own procedure, the Office of Statewide Pretrial Services would direct this defendant to either report by phone or in person to verbally confirm compliance; but the pretrial officer does not do home visits, unannounced visits because it's been deemed to be too dangerous for them.

In addition, the pretrial officer really has no way to monitor any conditions that this Court could impose nor do they have the appropriate training to monitor certain conditions such as this defendant not being on social media in any way, shape or form, not communicating with minors, whether that's through social media apps or texting, in-person contacts. There's no way to verify that this defendant would not be living within an area restricted under the Sex Offender Registration Act. So, here, great, I can order this defendant not to have any social media contacts; but the reality is that the pretrial officer would do nothing if there's a violation except file a report that may or may not make itself to the Court in a timely manner. So, short of monitoring his, the defendant's phone himself, just, there's just no way

- 15 -

to know. If the defendant deleted some type of communication or hid some type of evidence in an app, our pretrial officers know nothing about that.

THE DEFENDANT: Your Honor,—

THE COURT: Hold on.

Further, although OSPS has the ability to place this defendant on home confinement or electronic monitoring, I don't believe that would prevent this defendant from communicating with minor victims or being on social media. As far as home confinement is concerned, it's kind of a misnomer because it's technically not home confinement. First of all, there's nobody there confirming that the defendant's at home. OSPS doesn't do surprise visits to make sure that the defendant remains at home, if that's where he's supposed to be. OSPS would not be able to verify that there would be no minor children. I don't know if the neighbors have minor children, for example, or anybody in the neighborhood has a minor child; and OSPS would do nothing to confirm that.

Moreover, the reason I say it's somewhat of a misnomer is because my understanding, and I think this is set forth in People's Exhibit 1, is that the law indicates, yes, that OSPS would give the defendant 48 hours per week outside of the home, two times per week; so, there would be periods of, in addition, 48 hours nonconsecutive, can be nonconsecutive. So, basically, the defendant has a significant period of time where he's out and about doing whatever he wants, with no ability to determine what exactly it is he's doing, who he's communicating with, and whether or not he is in the area of any minor children.

Now, there would be GPS, I guess, available; but that only tells me where the defendant is at, not what he's doing. It doesn't tell me if there's minor children with him, near him, if he's communicating with minor children. And if there would be a violation of GPS, because a violation of home confinement would not be, the Court would have no idea and neither would OSPS, but if there was a violation of the GPS, then I think that would be alerted to OSPS who would then file a report; they have no ability to act on any violations no matter how severe they are.

So, in this case, given all of the foregoing, well, as I've already indicated the proof is evident and the presumption great that this defendant has committed a qualifying offense for which he would be statutorily eligible for detention under the dangerousness standard.

I do find, because he is in this community, the minor, the victim in this case is a minor, she is still in this community, the defendant has admitted or at least provided information that he had another victim, that minor, that person is still a minor, the defendant is employed in this community and has contact in this community, so, I do find that he does pose a real and present threat to the safety, not only of the victim in this case, the other potential victim that he has identified, as well as young children that are in the community.

I also find that there are no conditions of pretrial release or combination thereof that could mitigate the real and present threat to the safety, not only of the victim in this case who is a minor and still living in this area, but also any other minor children this defendant may have contact with.

I do find that this defendant should be detained and/or denied pretrial release, because he does pose a significant and real danger to the victim in this case as well as minor children in the community; and that there is no combination of available pretrial conditions that would adequately mitigate the high risk to the victim in this case and the community.

In addition, I find that less restrictive conditions cannot and would not avoid the very real and present threat to the safety of the victim in this case and minor, other young minors in the community because, as set forth in more detail above, I do not believe that the Office of Statewide Pretrial Services is in a position to meaningfully monitor and enforce any pretrial conditions this Court could impose, nor would such conditions prevent this defendant from committing other offenses."

¶ 16                            B. Defendant's Motion for Relief

¶ 17       On May 12, 2025, defendant filed a motion for relief, claiming, among other things, the trial court erred by determining that he posed an unmitigable threat to the safety of persons or the community. In that motion, defendant stressed again that he had no access to minors and that the charged offense was alleged to have happened only once, almost five years before. He also alleged that GPS location monitoring could mitigate any risk he might still be thought to pose.

¶ 18       On June 30, 2025, the trial court conducted a hearing on the motion and denied it, explaining that it had taken judicial notice of the previous detention hearing, the evidence proffered therein, the exhibits received, the arguments of the attorneys, and the pretrial bond report. The court also noted it had had an opportunity to review the report of proceedings. The court concluded that it had not heard anything that would cause it to change its April 30 decision.

¶ 19                                    II. ANALYSIS

¶ 20          Defendant appeals, arguing that "the State did not prove by clear and convincing evidence that [defendant] posed an unmitigable real and present threat of sexual assault of [the victim] or any other child where [defendant] proffered that he no longer had a pseudo-familial relationship with any child, and the State's proffer, including that [defendant] had not assaulted [the victim] for at least five years, was consistent with [defendant's]."

¶ 21          On August 14, 2025, the Office of the State Appellate Defender, defendant's counsel on appeal, filed a memorandum in support of defendant's Illinois Supreme Court Rule 604(h) (eff. Apr. 15, 2024) appeal. On August 28, 2025, the State filed its memorandum of law, asking this court to deny defendant's appeal of the trial court's order to detain him while he awaits trial.

¶ 22          In *People v. Morgan*, 2025 IL 130626, ¶ 51, the Illinois Supreme Court held that when parties to a pretrial detention hearing proceeded solely by proffer, the reviewing court's standard of review is *de novo*. Because no live witness testimony was presented at the pretrial detention hearing in this case, this court will review the trial court's decision using a *de novo* standard of review.

¶ 23          Consistent with our *de novo* review in this case, we reverse the trial court's order for the pretrial detention of defendant for the following reasons.

¶ 24          First, the alleged crime occurred many years ago, sometime between 2017 and 2020. The State has not claimed that defendant has committed any new crimes since that time. We also note that defendant has no record of criminal convictions prior to this allegation.

¶ 25          Second, defendant scored a zero on the VPRAI-R. The VPRAI-R noted the failure rate for people with a score of 0 was 6.1%, which includes technical violations of pretrial release

conditions. Despite the seriousness of the alleged crime, the fact defendant has not reoffended since the allegation in this case is more persuasive than the prosecutor's speculation that defendant might reoffend if he is released with conditions. Further, nothing in the report or record suggests defendant is unlikely to comply with the conditions of pretrial release.

¶ 26     Third, defendant has a permanent residence in Pontiac, has resided there for the past three years, and is gainfully employed full-time. His attorney also proffered he does not have access to any children under the age of 18. The trial court noted the possibility that defendant could have access to minors during his employment, but the record contains nothing to support that speculation.

¶ 27     Fourth, to the extent that the State and trial court have concerns about the capability of OSPS to monitor defendant in the community, we conclude the trial court placed undue importance on this issue. One reason for the court's doing so may be that the prosecutor argued that GPS monitoring or a SCRAM device cannot tell the office if defendant is in contact with a minor.

¶ 28     The trial court noted home confinement or electronic monitoring could be an option but doubted either would stop defendant from contacting minors or using social media. The court apparently based this concern on its expectation that OSPS would not be able to monitor defendant. But, as we have noted, this concern has only minimal relevance when weighed against the other factors we have mentioned.

¶ 29     Significantly, the trial court never explained how defendant posed a real and present threat to the community or the alleged victim. The record provides minimal information about the victim, indicating only that the victim was under the age of 13 at the time of the alleged

offense. The record provides no information regarding the victim's present age, residence, or the nature and timing of her interactions with defendant.

¶ 30                                III. CONCLUSION

¶ 31          On this record, we conclude that the State failed to show by clear and convincing evidence that (1) defendant posed a real and present threat to the safety of any person or persons in the community and (2) no condition or combination of conditions could mitigate any real and present threat of sexual assault or other harm to the victim or any other child. Accordingly, we reverse the trial court's judgment and remand for a determination of the appropriate conditions of release, as contemplated by subsection 110-10(b) of the Code (725 ILCS 5/110-10(b) (West 2024)).

¶ 32          Reversed and remanded with directions.